NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections @ akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

KEVIN DALTON,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13149
Trial Court No. 3AN-17-04785 CR

O P I N I O N

No. 2682 — November 6, 2020

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael D. Corey, Judge.

Appearances: Margi A. Mock, under contract with the Public Defender Agency, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge HARBISON.

Kevin Dalton pleaded guilty, pursuant to a plea agreement, to second-degree sexual abuse of a minor.[1] On appeal, Dalton challenges two probation conditions, which implicate his constitutional rights to familial association and free speech. As we have previously recognized, probation conditions that infringe constitutional rights are subject to special scrutiny and require the sentencing court to "affirmatively consider, and have good reason for rejecting, any less restrictive alternatives."[2] For the reasons explained in this decision, we remand this case for the trial court to reconsider both conditions under the appropriate standard.

*Factual and procedural background*

In June 2017, twelve-year-old H.D. reported that her stepfather, Dalton, had entered her bedroom in the middle of the night and sexually penetrated her. According to H.D., Dalton gave her two pills of what she believed was a "muscle relaxer" earlier in the evening. (Dalton later admitted that the pills were sleeping pills.) After taking one of the pills, H.D. fell asleep. She later awoke to find Dalton touching her vagina. Dalton then penetrated her anus with his penis.

H.D. reported the abuse to her mother, and her mother contacted the police. Pursuant to a search warrant, the police searched Dalton's iPad and discovered multiple visits, in the seventy-two hours preceding the abuse, to a pornography website, where Dalton viewed files including, "Dad fucks sleeping step daughter 01," and "Surprise buttsex."

---

[1]   AS 11.41.436(a)(2).

[2]   *Simants v. State*, 329 P.3d 1033, 1038-39 (Alaska App. 2014).

Dalton was charged with two counts of first-degree sexual abuse of a minor.[3] He later pleaded guilty, pursuant to a plea agreement, to a single reduced charge of second-degree sexual abuse of a minor,[4] with a stipulation that his conduct was among the most serious included within the definition of the offense.[5] The agreement left the length and terms of Dalton's sentence to the discretion of the trial court.

The trial court ultimately imposed a sentence of 20 years with 10 years suspended (10 years to serve), as well as 10 years of probation. Over Dalton's objection, the court also imposed probation conditions that: (1) restricted his contact with "the victim(s) of [his] crime(s)" and (2) prohibited internet access without prior approval from his probation officer.

*The probation condition prohibiting contact must be narrowly tailored to avoid infringement on Dalton's constitutional right to familial association*

On appeal, Dalton first challenges a probation condition that prohibits him from contacting "the victim(s) of [his] crime(s)" without written permission from his probation officer and his sex offender treatment provider. Dalton does not argue that he should be permitted to contact H.D. However, in this context, the statutory definition of "victim" includes not only H.D., but also H.D.'s mother, Alicia D., because H.D. is a minor.[6] Because Alicia D. and Dalton have two young sons together, Dalton argues that

---

[3]   AS 11.41.434(a).

[4]   AS 11.41.436(a)(2).

[5]   AS 12.55.155(c)(10).

[6]   *See* AS 12.55.185(19) (defining "victim" to include: "(A) a person against whom an offense has been perpetrated; [and] (B) one of the following, not the perpetrator, if the person specified in (A) of this paragraph is a minor, incompetent, or incapacitated: (i) an individual
(continued...)

this condition will unduly restrict his familial association with his biological children, as well as with Alicia D. herself.

Both parties agree that this condition must be construed narrowly to avoid infringement of Dalton's constitutional right to familial association. Both parties also agree that Alicia D., rather than a probation officer and treatment provider, should have the power to determine whether and to what extent to allow contact. Indeed, the trial court also agreed with this premise, and stated its intent "to leave contact in the hands of the victims and their election." The probation condition ultimately imposed fails to effectuate this intent, instead allowing a probation officer and treatment provider to potentially override Alicia D.'s wishes.

The State concedes that we should remand this probation condition to the trial court for further proceedings. We have reviewed the record, and we agree that a remand is required to ensure that the no-contact condition is appropriately narrow to avoid any unnecessary interference with Dalton's constitutional rights.[7]

*The probation condition making all internet access contingent on probation officer discretion unduly restricts Dalton's liberty*

Dalton also challenges a probation condition that prohibits him from accessing the internet without his probation officer's permission. Dalton contends that this condition impermissibly delegates the sentencing court's duty to apply special

---

[6]   (...continued)
living in a spousal relationship with the person specified in (A) of this paragraph; or (ii) a parent, adult child, guardian, or custodian of the person").

[7]   *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring an appellate court to independently evaluate any concession of error by the State in a criminal case).

scrutiny to a condition implicating Dalton's First Amendment rights.[8]  The State urges us to uphold the condition based on our decisions in *Dunder v. State*[9] and *Diorec v. State*.[10]

In *Dunder v. State*, we reviewed a probation condition that prohibited possession of "any device capable of accessing the internet, storing movies, or photographs[,] or [that] has a wireless capability such as an iPod, MP3 player device[,] or a cell phone."[11]  We recognized the burden such a condition placed on an offender's reintegration into society:

> Dunder points out that it is difficult to function in modern society without access to the technology that Judge Smith's order prohibits him from possessing.  He further suggests that, by the time he is released from his lengthy term of imprisonment, it will likely be even more difficult to function in society "without the use of at least one electronic device." Given the rapid advance of technology and the length of Dunder's sentence of imprisonment, we agree that some degree of access to these devices will probably be necessary to Dunder's reintegration into society.[12]

---

[8]  *Cf. Packingham v. North Carolina*, 137 S.Ct. 1730, 1737 (2017) (holding that prohibiting all access to social networking websites impermissibly infringed the First Amendment rights of registered sex offenders).

[9]  *Dunder v. State*, 2009 WL 1607917 (Alaska App. June 10, 2009) (unpublished).

[10]  *Diorec v. State*, 295 P.3d 409 (Alaska App. 2013).

[11]  *Dunder*, 2009 WL 1607917, at *1 (alteration in original).

[12]  *Id.*

As an alternative to a total ban, we approved a probation condition "that prohibited Dunder from using or possessing Internet-capable, wireless, and electronic storage devices unless he obtains permission from his probation or parole officer."[13]

Similarly, in *Diorec v. State*, we upheld a probation condition that prohibited a defendant "from opening an Internet account or accessing the Internet from another person's account without the prior written permission of his probation officer."[14] In holding that "[i]t was reasonable for the [trial] court to conclude that supervision of Diorec's access to the Internet could promote his rehabilitation and protect the public, and that Diorec's probation officer [would] allow any reasonable Internet use that is important for his rehabilitation," we noted that, "[m]any courts have approved similar conditions when the Internet ban can be relaxed or modified by a probation officer."[15]

We decided *Dunder* in 2009 and *Diorec* in 2013. In the intervening years, the role of the internet in society has only grown — and the "many courts" we relied on in upholding the conditions in *Dunder* and *Diorec* no longer concur with each other on whether a total internet ban, subject to modification by a probation officer, is sufficiently narrowly tailored to survive special scrutiny. Of the seven United States Circuit Courts of Appeals we cited in *Diorec*, nearly half have since held that probation officer approval is not a sufficient safeguard for First Amendment rights in this context.[16]

---

[13] *Id.*

[14] *Diorec v. State*, 295 P.3d 409, 412, 418 (Alaska App. 2013).

[15] *Id.* at 418 & n.25 (citing decisions from several federal circuit courts of appeals); *see also Dunder*, 2009 WL 1607917, at *1 n.7 (citing decisions upholding similar conditions).

[16] *See United States v. Holena*, 906 F.3d 288, 290-95 (3d Cir. 2018); *United States v. LaCoste*, 821 F.3d 1187, 1191-92 (9th Cir. 2016); *United States v. Blair*, 933 F.3d 1271, 1275-81 (10th Cir. 2019).

For instance, in *United States v. Holena*, the Third Circuit vacated probation conditions prohibiting a probationer from possessing or using computers, or otherwise accessing the internet without his probation officer's approval.[17] The Third Circuit acknowledged that restricting Holena's internet access was "necessary to protect the public," in light of the role the internet had played in his underlying offense, which involved repeatedly visiting an online chat room and attempting to entice a fourteen-year-old boy to meet him in person to engage in sexual acts.[18] Nonetheless, the court concluded that the internet restriction was overbroad and unduly restrictive of liberty because it "gave the probation office no guidance on the sorts of internet use that it should approve."[19] The court found "no justification for stopping Holena from accessing websites where he will probably never encounter a child, like Google Maps or Amazon. The same is true for websites where he cannot interact with others or view explicit materials, like Dictionary.com or this Court's website."[20]

In *United States v. Blair*, the Tenth Circuit reached a similar conclusion, explaining why a condition that may have been upheld under prior case law was nonetheless unduly restrictive:

---

[17]  *Holena*, 906 F.3d at 290.

[18]  *Id.*

[19]  *Id.* at 293.

[20]  *Id.*; *see also LaCoste*, 821 F.3d at 1192 ("When a total ban on Internet access cannot be justified, as is the case here, we have held that a proviso for probation-officer approval does not cure the problem. And for good reason: If a total ban on Internet use is improper but a more narrowly tailored restriction would be justified, the solution is to have the district court itself fashion the terms of that narrower restriction. Imposing a total ban and transferring open-ended discretion to the probation officer to authorize needed exceptions is not a permissible alternative.") (citation omitted).

In [*United States v. Ullmann*, 788 F.3d 1260, 1261 (10th Cir. 2015)], we described the Internet as "a means of communication that has become a necessary component of modern life." Four years later, the role that computers and the Internet play in our everyday lives has become even more pronounced, and we expect that trend to continue. Thus, what was a reasonable restriction on Internet-use in our earlier cases may be different from what is reasonable today. We must read our prior cases in light of the evolution of the Internet and the public's dependency on it.[21]

Several of our sister states have adopted a similar approach.[22] For example, in *State v. R.K.*, the Appellate Division of the New Jersey Superior Court struck down a parole condition allowing access to social media only with prior permission from the district parole supervisor.[23] The court rejected the argument that the district parole supervisor's ability to modify the ban acted as an appropriate "escape valve" to save the ban from "constitutional fatality": "Neither the [Parole] Board nor its parole officers

---

[21] *United States v. Blair*, 933 F.3d 1271, 1277 (10th Cir. 2019).

[22] *See, e.g.*, *Weida v. State*, 94 N.E.3d 682, 691-93 (Ind. 2018) (concluding that a condition making internet access contingent upon prior probation officer approval "reaches beyond reasonableness into unreasonableness"); *State v. R.K.*, 232 A.3d 487, 502 (N.J. Super. App. Div. 2020) ("[T]he parole officer should not be given the authority to make [an internet] ban constitutional when we have determined it is unconstitutional."); *In the Matter of the Personal Restraint of Sickels*, 461 P.3d 322, 335 (Wash. App. 2020) ("Delegating authority to Mr. Sickels's supervising [community corrections officer] to approve internet access does not solve the problem; a sentencing court may not wholesaledly abdicate its judicial responsibility for setting the conditions of [community custody]."); *Mutter v. Ross*, 811 S.E.2d 866, 873 n.38 (W. Va. 2018) ("[T]he fact that Defendant may use the Internet if he obtains prior written approval from his probation officer cannot salvage this otherwise overly broad restriction." (citing *United States v. Maxson*, 281 F.Supp.3d 594, 600 (D. Md. 2017))).

[23] *R.K.*, 232 A.3d at 490.

should be the gatekeeper to determine whether a person's, even a parolee's, constitutional free speech rights via access to social media should be unlocked."[24]

Likewise, in *Weida v. State*, the Indiana Supreme Court vacated probation conditions prohibiting internet access without probation officer permission.[25] Weida was convicted of felony incest after he had sexual intercourse with his sixteen-year-old niece, K.M.[26] Leading up to this offense, Weida used his cell phone to search for explicit pictures on the internet, which he then showed to K.M.[27] The court concluded that a total internet ban, subject only to the exercise of a probation officer's discretion, was unreasonable:

> Here, the record reveals Weida has no history of misusing the internet or using the internet to perpetrate a crime. However, the record does show that Weida used the internet shortly before committing incest with K.M. He admitted googling explicit photos and showing them to K.M. He likewise admitted viewing an incest website before having sex with K.M. We cannot ignore that when Weida enjoyed unfettered internet access he committed incest. Whether or not he intentionally groomed K.M. for sex, there is no doubt the two went from talking, to looking at sexually explicit material online, to having sex. But Weida's troubles recognizing sexual boundaries in person and online should not result in a far-reaching, broad internet ban.[28]

---

[24]  *Id.* at 501-02.

[25]  *Weida*, 94 N.E.3d at 693.

[26]  *Id.* at 686.

[27]  *Id.*

[28]  *Id.* at 693.

We agree with the reasoning of those courts that have recognized the growing necessity of internet access for full participation in modern society, and for the rehabilitation of offenders.[29] In particular, we agree with the Tenth Circuit's conclusion that "what was a reasonable restriction on Internet-use in our earlier cases may be different from what is reasonable today. We must read our prior cases in light of the evolution of the Internet and the public's dependency on it."[30]

Since our decision in *Diorec* in 2013 — and especially since our decision in *Dunder* more than a decade ago — dependence on the internet in daily life has grown considerably.[31] Accordingly, the burden that an internet ban places on probationers seeking to reintegrate into society has likewise grown considerably.[32] What may have

---

[29] *See, e.g.*, *United States v. Eaglin*, 913 F.3d 88, 98 (2d Cir. 2019) ("[A]ccess to the Internet is essential to reintegrating supervisees into everyday life, as it provides avenues for seeking employment, banking, accessing government resources, reading about current events, and educating oneself."); *Weida*, 94 N.E.3d at 687 ("We live in the internet age. The internet, cyberspace, the World Wide Web, whatever moniker you choose, pervades our daily lives. For many, we even carry the internet around in our pockets or purses. Our cell phones provide the gateway into cyberspace's vast domains. [Indiana citizens] accomplish life's most meaningful and mundane everyday tasks with cyberspace at our fingertips. We apply for jobs, we file tax returns, we pay bills, we attend college, we read the news, we navigate, we communicate, we shop — all online.").

[30] *United States v. Blair*, 933 F.3d 1271, 1277 (10th Cir. 2019).

[31] *See* Pew Research Center, *Internet/Broadband Fact Sheet*, Internet Use Over Time, https://www.pewresearch.org/internet/fact-sheet/internet-broadband (reporting that 90% of adults in the United States used the internet in 2019, compared to 84% in 2013 and 76% in 2009); Pew Research Center, *About Three-in-Ten U.S. Adults Say They Are 'Almost Constantly' Online*, FACTANK, https://www.pewresearch.org/fact-tank/2019/07/25/americans-going-online-almost-constantly (reporting that 81% of Americans used the internet on a daily basis in 2019).

[32] *See, e.g.*, *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016) ("Use of the
(continued...)

been an inconvenience a decade ago — though admittedly a substantial one — may now be an almost total hindrance to reentry into modern society and meaningful participation in public discourse.[33] These developments have called into question our decisions in *Diorec* and *Dunder*.

But Dalton does not ask us to overrule those cases; instead, he argues that they are factually distinguishable. We agree, and we accordingly resolve Dalton's claim narrowly. On the record before us, we hold that conditioning Dalton's internet access on probation officer approval unduly restricts Dalton's liberty.

The internet's role in Dalton's offense does not approach its role in *Dunder* and *Diorec*. Dunder's offenses "directly involved the use of a computer and the Internet to commit serious sexual offenses against minors," *i.e.*, two counts of sexual abuse of a minor and the distribution of child pornography.[34] Diorec's offenses involved a seven-month long scheme to pose as a sixteen-year-old boy on Twitter, and the use of that online profile to contact teenage girls, one of whom was his fourteen-year-old

---

[32] (...continued)
Internet is vital for a wide range of routine activities in today's world — finding and applying for work, obtaining government services, engaging in commerce, communicating with friends and family, and gathering information on just about anything, to take but a few examples. Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy.").

[33] *See Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace — the 'vast democratic forums of the Internet' in general, and social media in particular." (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997))) (additional citations omitted).

[34] *Dunder v. State*, 2009 WL 1607917, at *1 (Alaska App. June 10, 2009) (unpublished).

stepdaughter.[35] Diorec then abused one of the internet's more benign purposes — online shopping — to purchase a spy camera, which he installed in a smoke detector in his stepdaughter's bedroom to record her surreptitiously, after giving her lubricant and a sex toy.[36] By contrast, Dalton's use of the internet was limited to viewing several files on a child pornography website.

*Dunder* and *Diorec* do not stand for the proposition that a sentencing court may impose an internet ban whenever there is a factual nexus between the internet and the defendant's underlying offense. We acknowledge — and Dalton does not dispute — that there is a nexus between Dalton's use of the internet and the sexual abuse he thereafter perpetrated against H.D. We cannot ignore the role of the internet in Dalton's offense, nor would we ask the sentencing court to ignore it. But as the Indiana supreme court noted, a defendant's "troubles recognizing sexual boundaries in person and online should not result in a far-reaching, broad internet ban."[37] The internet played far less of a role in Dalton's offense than it did in either Dunder's distribution of child pornography, or Diorec's seven-month-long campaign to sexually stimulate, record, and exploit his stepdaughter. In short, while we agree with the trial court that there was a factual nexus justifying a restriction on Dalton's internet access, a complete internet ban, subject only to the unconstrained discretion of a probation officer, unduly restricts Dalton's liberty.[38]

---

[35] *Diorec v. State*, 295 P.3d 409, 412 (Alaska App. 2013).

[36] *Id.* at 412.

[37] *Weida v. State*, 94 N.E.3d 682, 693 (Ind. 2018).

[38] We held in *Diorec* that "a condition prohibiting Internet access *could* be reasonable only if the condition allows a probation officer to allow necessary Internet use under appropriate conditions." *Diorec*, 295 P.3d at 418 (emphasis added). We did not hold that a condition prohibiting internet access is *necessarily* reasonable whenever a probation officer

(continued...)

*On remand, the trial court must narrowly tailor any restrictions on Dalton's internet access*

The record shows that the trial court was troubled by the broad scope of the internet restriction and attempted to remedy it. The court recognized "[t]he reality . . . that Mr. Dalton is not going to be in jail forever. . . . [And] unless there's significant changes in society between now and when Mr. Dalton's ultimately released, the genie's out of the bottle. And the internet . . . is not going away." The court thus sought to impose something less than a full internet ban, something that would allow Dalton access to the internet with appropriate probation supervision, so that he could "establish a track record of being able to [use the internet] in an acceptable fashion." To this end, the court proposed modifying the condition to allow Dalton to open and maintain a single internet account, which would be subject to warrantless searches and probation officer monitoring.

Dalton objected to the court's proposal, arguing that the internet is "the air that we all breathe now," and that any restriction on his internet access was impractical and unduly restrictive. After hearing an explanation of the probation office's standard procedure for granting internet access — including conducting an individualized risk assessment, consulting with treatment providers, and considering available monitoring tools such as software or supervised use — the court ultimately decided to impose the original condition rather than attempting to craft a narrower restriction.

---

[38] (...continued)
has discretion to allow exceptions to the ban. Thus, *Dunder* and *Diorec* do not stand for the broad proposition suggested by the State that a probation officer's discretion cures any unconstitutionality in an otherwise overbroad internet restriction.

On remand, we encourage the trial court to resume its consideration of less restrictive alternatives to limit Dalton's internet access.[39] We note that the trial court's proposed modification would allow Dalton to join the vast majority of American adults who use the internet on a daily basis for a full range of activities, including those implicating First Amendment rights. But it would also allow his probation officer to monitor his internet use from a discrete access point, without having to police Dalton's access to a potentially unlimited number of devices and accounts. On remand, the trial court may again consider this potential restriction or any other narrowly tailored condition consistent with the principles discussed above.

*Conclusion*

We REMAND Dalton's case to the trial court for reconsideration of the probation conditions restricting contact with Alicia D. and Dalton's biological children, as well as Dalton's access to the internet. The trial court must apply special scrutiny analysis to both conditions.

---

[39] *Simants v. State*, 329 P.3d 1033, 1038-39 (Alaska App. 2014) (holding that trial courts must subject probation conditions implicating constitutional rights to special scrutiny and "affirmatively consider, and have good reason for rejecting, any less restrictive alternatives").