**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 25, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RICHARD HOLZER,

    Defendant - Appellant.

No. 21-1080

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:19-CR-00488-RM-1)**

_____

Grant R. Smith, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the District of Colorado, Denver, Colorado, appearing for Appellant.

Paul Farley, Assistant United States Attorney (Cole Finegan, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.

_____

Before **BACHARACH**, **BRISCOE**, and **McHUGH**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Defendant Richard Holzer was arrested and criminally charged after federal undercover agents determined that Holzer had taken substantial steps towards bombing a synagogue in Pueblo, Colorado.  Holzer subsequently pleaded guilty,

pursuant to a written plea agreement, to one count of intentionally attempting to obstruct persons in the enjoyment of their free exercise of religious beliefs through force, in violation of 18 U.S.C. §§ 247(a)(2) and (d)(3), and one count of maliciously attempting to damage and destroy, by means of fire and explosives, a synagogue, in violation of 18 U.S.C. § 844(i). The district court sentenced Holzer to a term of imprisonment of 235 months, to be followed by a fifteen-year term of supervised release. The district court also ordered Holzer to comply with eleven special conditions of supervised release, including Special Condition Nine, that prohibits him from acquiring, possessing, or using any material depicting support for or association with antisemitism or white supremacy.

Holzer now appeals, arguing that the district court erred in imposing Special Condition Nine. Specifically, Holzer argues that Special Condition Nine infringes on his First Amendment rights, and that the district court failed to make any particularized findings to support the special condition. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that Holzer's challenge to Special Condition Nine is barred by the appellate waiver provision of his plea agreement. Consequently, we dismiss Holzer's appeal.

I

*Factual background*

Holzer, who was living in Pueblo, Colorado at the time of the offenses in this case, used multiple social media accounts to promote white supremacy ideology and acts of violence that were both racially and religiously motivated. In late September

2

2019, an Online Covert Employee (OCE) employed by the Federal Bureau of Investigation (FBI) contacted Holzer and told him that Facebook suggested that they should be friends. The OCE's Facebook account portrayed the OCE as a white female who was supportive of white supremacy ideology. Holzer accepted the OCE's friend request and soon thereafter began sending the OCE a variety of messages, photographs, and videos, all of which were focused on white supremacy and related acts of violence. For example, Holzer told the OCE that in October 2018, he had paid an individual to place arsenic in the pipes of a local synagogue.

In early October 2019, Holzer told the OCE that he was preparing for a racial holy war and that he intended to poison the water supply at Temple Emanuel, a synagogue located in Pueblo, Colorado. Holzer invited the OCE to participate in those efforts, and proceeded to explain where he could obtain arsenic to carry out the poisoning. The OCE responded by telling Holzer that she had friends who would soon be in the area of Colorado Springs. Holzer replied that he was interested in meeting the OCE's friends.

On October 12, 2019, an FBI undercover agent (UC-1) contacted Holzer and presented himself as one of the OCE's friends. UC-1 told Holzer that he and some friends planned to be in Colorado Springs the following week. Holzer sent UC-1 several photos of himself with various images, paraphernalia, and clothing associated with white supremacy and Nazi ideology. Holzer also told UC-1 that he was planning to poison a synagogue in Pueblo. Over the next several days, Holzer

continued to send UC-1 images related to white supremacy and Nazi ideology. Holzer and UC-1 made plans to meet in person.

On October 17, 2019, three undercover FBI agents (UCs) posing as the OCE's friends met with Holzer in Colorado Springs. Holzer brought white supremacy paraphernalia as gifts for the UCs, including a flag, several patches, a metal Thor's hammer, and a mask. Holzer told the UCs about his efforts in October 2018 to poison a synagogue's water supply, and falsely claimed that he caused that synagogue to be shut down for months. Holzer then talked about poisoning the water supply at Temple Emanuel, with the goal of shutting the synagogue down and "mak[ing] them know they're not wanted here." ROA, Vol. I at 72. When one of the UCs asked Holzer an open-ended question about what other methods he was considering, Holzer mentioned welding the doors shut and suggested that he could put together Molotov cocktails to throw through the synagogue's windows. Holzer also repeatedly expressed his hatred of Jewish people and discussed his efforts to drive them out of Pueblo.

Following the meeting, Holzer and the UCs drove to Pueblo to visit Temple Emanuel and determine what type of attack would be most effective. While at Temple Emanuel, Holzer opined that Molotov cocktails would not be sufficient to destroy the entire building. Holzer and the UCs then discussed using pipe bombs. The UCs offered to supply the pipe bombs, but cautioned that it would take some time because they would need to bring them in from out of state. Holzer stated in response, "Let's get that place off the map." *Id*.

4

Following the meeting, Holzer continued to take steps in furtherance of bombing Temple Emanuel. On October 19, 2019, Holzer sent UC-1 a video showing him walking around the exterior of Temple Emanuel and commenting on various features of the building. Later that day, Holzer participated in a group chat with the UCs to discuss the bombing plot. During that chat, one of the UCs wrote, "Let me know what you want the end result to look like and I'll get to work." *Id*. at 73. Holzer responded the next day with a photo of a church, half of which had crumbled to the ground, and stated, "Let's have it look something like that." *Id*.

On October 31, 2019, Holzer met again with UC-1. The two discussed the plan to attack Temple Emanuel and agreed that Holzer would meet with the UCs at a motel around 9:00 p.m. on November 1 to examine the explosives before going to Temple Emanuel. At Holzer's request, they went to a store to purchase gloves to use during the attack. Holzer repeatedly affirmed that he was prepared to go through with the attack the following night. When UC-1 raised the possibility of someone being inside Temple Emanuel when the explosives were detonated, Holzer stated that he did not think anyone would be there, but that he would not care if they were because they would be Jewish.

On the evening of November 1, 2019, UC-1 picked up Holzer and drove him to a motel where two of the other UCs were waiting. One of the UCs showed Holzer two pipe bombs and two bundles each containing seven sticks of dynamite.[1] Holzer

---

[1] Although the UCs told Holzer that the pipe bombs and dynamite were functional, in fact they were all inert. Further, although the UCs told Holzer that two

examined the explosives and declared, "this is absolutely gorgeous." *Id*. at 74–75.

Holzer then asserted that they should carry out the attack at 2:30 or 3:00 in the

morning in order to avoid the police.

Shortly thereafter, Holzer was arrested and transported to a police station

where he waived his *Miranda* rights and agreed to speak with the FBI. Holzer

admitted that he had been planning to blow up Temple Emanuel that night with the

pipe bombs and dynamite in the motel room. He referred to the plan as "my

mountain" and to Jews and Temple Emanuel as a "cancer" on the community. *Id*. at

75. Although Holzer stated that he had not planned on hurting anyone, when asked

what he would have done if there had been someone inside Temple Emanuel when he

arrived that night, he admitted that he would have gone through with the attack

because anyone inside would have been Jewish.

*Procedural background*

On November 2, 2019, a criminal complaint was filed in the United States

District Court for the District of Colorado charging Holzer with one count of

attempting to obstruct religious exercise by force using explosives and fire, in

violation of 18 U.S.C. §§ 247(a)(2) and (d)(3).

On November 21, 2019, a federal grand jury returned a three-count indictment

against Holzer. Count 1 charged Holzer with intentionally attempting to obstruct

---

of them brought the pipe bombs and dynamite to Colorado from out of state, in fact
the dynamite and simulated black powder contained within the pipe bombs was
shipped by the FBI from Quantico, Virginia, to Colorado to be used in the undercover
operation.

persons in the enjoyment of their free exercise of religious beliefs through force and the attempted use of explosives and fire, in violation of 18 U.S.C. §§ 247(a)(2) and (d)(3). Count 2 charged Holzer with maliciously attempting to damage and destroy Temple Emanuel by means of fire and explosives, in violation of 18 U.S.C. § 844(i). Count 3 charged Holzer with using fire and an explosive to commit a federal felony, in violation of 18 U.S.C. § 844(h)(1).

On October 15, 2020, Holzer pleaded guilty, pursuant to a written plea agreement with the United States, to Counts 1 and 2 of the indictment. The plea agreement included a "Waiver of Appeal" section that stated as follows:

> The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds 240 months; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

> The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement.

7

*Id*. at 63.

A presentence investigation report (PSR) was prepared and submitted to the district court and the parties in December 2020.  Attached to the PSR was an exhibit titled "SENTENCING RECOMMENDATION."  ROA, Vol. 2 at 34.  That exhibit, consistent with the calculations in the PSR, recommended that the district court impose sentences of 204 months' custody on each of Counts 1 and 2, with the sentences to run concurrently.  The exhibit also recommended a three-year term of supervised release as to Count 1 and a fifteen-year term of supervised release as to Count 2, with the two terms to run concurrently.  The exhibit listed mandatory, standard, and special conditions of supervised release that it recommended the district court adopt.  Among the proposed special conditions of supervised release was the following: "You shall not possess, view, access, or otherwise use material that is primarily associated with extremist views or organizations (including but not limited to anti-Semitic material)."  *Id*. at 35.

Holzer filed a written objection to the above-quoted special condition of supervised release recommended in the exhibit to the PSR.  Holzer argued that the proposed special condition was "impermissibly vague" because it would "allow[] the U.S. Probation Office to determine, within its own discretion and without definition, what is 'extremist' and what material is 'primarily associated with' extremism."  *Id*. at 61.  Further, Holzer argued that the proposed special condition would infringe on his First Amendment rights because it would "amount[] to a severe restriction on [his] freedoms of religion, thought, and expression."  *Id*. at 64.

8

On January 25, 2021, the district court provided the probation officer and the parties with its own proposed special conditions of supervised release. Included among those proposed special conditions was Proposed Special Condition Nine, which stated:

> You shall not knowingly acquire, possess or otherwise use any photograph, flag, clothing, patch, imagery, jewelry, literature, or other material depicting support for or association with anti-Semitism or white supremacy. Specifically included in this prohibition, without limitation, are Mein Kampf, swastikas, iron crosses, other Nazi memorabilia or logos; Thor's hammer; KKK symbolism; numeric symbols: 12, 14, 18, 88, 311, or 1488; the Aryan Fist; 14 words; the Celtic cross; the Sonnenrad; the Valknut; and the Blood Drop Cross.

*Id.*, Vol. 2 at 841. Holzer objected to proposed Special Condition Nine, arguing that it was impermissibly vague, impermissibly delegated the court's authority to Holzer's probation officer, and infringed on his First Amendment rights.

The district court held a sentencing hearing on February 26, 2021. Holzer's counsel repeated the objection to proposed Special Condition Nine. The district court overruled defense counsel's objection. The district court imposed a term of imprisonment of 235 months, to be followed by a fifteen-year term of supervised release. The district court ordered that, during the period of supervised release, Holzer would be required to comply with standard conditions of supervision and eleven special conditions of supervised release, including Special Condition Nine (which was worded identically to the district court's proposed Special Condition Nine).

9

Final judgment in the case was entered on March 2, 2021. Holzer filed a notice of appeal on March 5, 2021.

## II

Holzer argues in his appeal that Special Condition Nine of his supervised release infringes on his First Amendment rights and was not supported by any particularized findings made by the district court. The government argues in response that Holzer's challenge to Special Condition Nine is barred by the appellate waiver provision of his written plea agreement. For the reasons outlined below, we agree with the government and therefore dismiss Holzer's appeal.

In *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) (en banc), we considered "how we should resolve appeals brought by defendants who have waived their appellate rights in a plea agreement." *Id*. at 1324. "In fashioning our analysis," we identified four guiding principles. *Id*. "First, every circuit that has considered enforcement of appellate waivers enforces at least some forms of appellate waivers." *Id*. "Second, contract principles govern plea agreements." *Id*. at 1324–25. "Third, a defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *Id*. at 1325 (quotation marks omitted). And "[f]ourth, appellate waivers benefit the government by saving the costs of prosecuting appeals; and only through the efficient dismissal of an appeal will the government receive the benefit of its bargain." *Id*. (quotation marks and brackets omitted).

We in turn adopted a "three-prong analysis" for deciding whether a criminal defendant has waived his appellate rights in an enforceable plea agreement. *Id*. "This analysis" requires us to determine: "(1) whether the disputed appeal falls within the scope of the waiver of appellate rights; (2) whether the defendant knowingly and voluntarily waived his appellate rights; and (3) whether enforcing the waiver would result in a miscarriage of justice." *Id*.

Applying this three-prong enforcement analysis to the case at hand, we conclude that all three prongs weigh against Holzer and require us to enforce the appellate waiver provision of his plea agreement.

*a) Scope of the waiver*

As previously noted, Holzer's written plea agreement included a section entitled "Waiver of Appeal" that stated, in pertinent part:

> The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds 240 months; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

ROA, Vol. 1 at 63.

The government argues that Holzer's appeal falls within the scope of the above-quoted waiver language because Holzer seeks in his appeal to challenge one of the terms of supervised release imposed by the district court. Aple. Br. at 17 (citing *United*

11

*States v. Sandoval*, 477 F.3d 1204, 1207 (10th Cir. 2007)). Holzer effectively concedes

that point, but argues in response that the issue he seeks to assert in his appeal falls within

the first listed exception in the above-quoted language because the challenged condition

"exceeds the maximum penalty provided in the statute of conviction." Aplt. Reply Br. at

1–2. More specifically, Holzer argues that "special supervised release condition number

nine exceeds the statutory limits of § 3583(d) and is unconstitutional." *Id*. at 2. In other

words, Holzer argues, condition number nine is "illegal" and "[a]n illegal sentence

exceeds the maximum penalty permitted by law." *Id*.

To resolve this question, we must first determine what the parties intended when

they employed in the appellate waiver provision of the plea agreement the phrase "the

maximum penalty provided in the statute of conviction." In doing so, "[w]e interpret a

plea agreement as we would any contract and in light of what the defendant reasonably

understood when she entered her plea." *United States v. Porter*, 905 F.3d 1175, 1178

(10th Cir. 2018) (quotation marks and brackets omitted). "[B]ecause the government

drafted the Plea Agreement, we construe all ambiguities against the government." *United

States v. Rubbo*, 948 F.3d 1266, 1268 (10th Cir. 2020).

The plea agreement in this case does not expressly define the phrase "the

maximum penalty provided in the statute of conviction," and the parties now offer

differing interpretations of that phrase. To begin with, the parties disagree as to whether

the "statute[s] of conviction" in this case are confined solely to the statutes that Holzer

pleaded guilty to violating, i.e., 18 U.S.C. §§ 247(a)(2), (d)(3) and 844(i), or whether they

also include the penalty provisions contained in 18 U.S.C. § 3583. Holzer, for his part,

12

concedes that the specific statutes that he pleaded guilty to violating do not expressly mention supervised release.  But, Holzer argues, these statutes of conviction effectively "incorporat[e] all of the penalty provisions contained in § 3583," which itself authorizes the imposition of supervised release on all criminal defendants convicted of violating federal law.  Aplt. Reply Br. at 3.  In support, Holzer argues that "[b]y enactment of the umbrella statute § 3583, Congress ensured that the penalty of supervised release, and the accompanying conditions of supervised release, would be incorporated into every federal criminal statute unless a specific statute provides otherwise." *Id*.  Thus, he argues, "[s]ection 3583 is provided for in every federal criminal statute unless the statute says otherwise." *Id*. at 4.

The government, on the other hand, argues that Holzer's "'statutes of conviction' are 18 U.S.C. §§ 247(a)(2), (d)(3) and . . . 844(i), and *not* § 3583(d)."  Aple. Br. at 12 (emphasis in original).  The government in turn asserts that because the statutes of conviction refer only to terms of imprisonment and fines and do not expressly refer to supervised release, exception (1) in the appellate waiver provision was therefore intended to focus solely on the maximum term of imprisonment (or fine) that could be imposed under each statute of conviction.  And in turn, the government argues, because Special Condition Nine does not involve either a term of imprisonment or a fine, it necessarily does not "exceed the maximum penalty provided in the statute[s] of conviction" and thus the exception does not apply.

We conclude that the specific language in the parties' plea agreement provides an answer to this question.  As Holzer correctly notes, the parties' plea agreement includes a

13

section entitled "STATUTORY PENALTIES." That section, which was presumably intended, at least in part, to help provide context to exception (1) set forth in the appellate waiver provision, specifically mentions supervised release:

> Based on the defendant's criminal history known at this time, the applicable maximum statutory penalty for a violation of 18 U.S.C. § 247(a)(2) and (d)(3) is not more than 20 years of imprisonment, not more than a $250,000 fine, or both, *not more than three years of supervised release.* The applicable maximum statutory penalty for a violation of 18 U.S.C. § 844(i) is not more than 20 years of imprisonment, not more than a $250,000 fine, or both, *not more than lifetime supervised release.*

ROA, Vol. 1 at 67 (emphasis added). Further, as Holzer notes in his reply brief, the district court mentioned these statutory maximum terms of supervised release at the change-of-plea hearing when it was explaining to Holzer "the maximum penalties" he was facing. *Id.*, Vol. 3 at 23–24.

In light of this language in the plea agreement, the district court's reference to the maximum terms of supervised release at the change-of-plea hearing, and the fact that any ambiguities in the plea agreement are construed against the government, we conclude that the phrase "maximum penalty provided in the statute of conviction" set forth in this plea agreement should be construed to include both the statutory terms of imprisonment that are set forth in the criminal statutes that Holzer pleaded guilty to violating *and* the terms of supervised release that are authorized in § 3583 for Holzer's crimes of conviction.

That is not the end of the matter, however, because the government makes one additional, and indeed critical, argument. According to the government, the term "'maximum' generally refers to something that can be quantified," and thus the phrase "'maximum penalty' denotes a specific quantity of time or restitution." Aple. Br. at 12.

14

The government in turn argues that "[a] *condition* of release—as opposed to a *term* of release—even if it is an unreasonable one, does not exceed a 'statutory maximum.'" *Id*. (emphasis in original).

We agree with the government's argument for three reasons. First, we note that the term "maximum" is commonly defined to mean "[t]he highest value or extreme limit," "[t]he highest possible magnitude or quantity of something which is attained, attainable, or customary; an upper limit of magnitude or quantity," and "[a]n upper limit imposed by authority." Oxford English Dictionary (3d ed. 2001). And the term "magnitude," which is employed in these dictionary definitions, means "[s]ize," "absolute value," and "[a] quantity, an amount."[2] *Id*.

Second, we note that the statutes of conviction that are expressly referenced in the exception to the appellate waiver provision in the parties' plea agreement themselves refer to numerical quantities. As noted, Holzer admitted to violating 18 U.S.C. § 247(a)(2), which makes it illegal to "intentionally obstruct[], by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so." The parties agreed in the plea agreement that the statutory "punishment for" violating § 247(a)(2) was "a fine in accordance with [Title 18] and imprisonment for not more than 20 years,

---

[2] Notably, the district court at the change-of-plea hearing couched exception (1) to the appellate waiver in terms of quantity or length of the sentence imposed. ROA, Vol. 1 at 18 ("The three things that would permit you to appeal are these; one, if I were to give you a sentence that was greater than the maximum penalty provided for in the statutes of conviction. In other words, greater than the statutory maximum.").

or both." 18 U.S.C. § 247(d)(3). Holzer also admitted to violating 18 U.S.C. § 844(i), which makes it illegal to "maliciously damage[] or destroy[], or attempt[] to damage or destroy, by means of fire or an explosive, any building . . . or other real . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Anyone convicted of violating the statute "shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both." 18 U.S.C. § 844(i). And § 3583, which we have concluded, given the unique wording of the plea agreement in this case, is encompassed by the plea agreement's phrase "maximum penalty provided in the statute of conviction," provides for maximum terms of supervised release in terms of years. Notably, the district court expressly referred to those maximum terms at the change-of-plea hearing. *See* 18 U.S.C. § 3583(b) (authorizing terms of supervised release ranging from one year to five years, depending upon the nature of the felony); *id*. § 3583(j) (authorizing supervised release for "any term of years or life" for certain terror offenses).

Third, our own case law supports the conclusion that the phrase "maximum penalty" denotes a specific quantity of time or restitution. In *United States v. Green*, 405 F.3d 1180 (10th Cir. 2005), we held, in the context of interpreting the meaning of *Hahn*'s miscarriage of justice exception, that "[o]rdinarily and naturally, the phrase 'statutory maximum' refers to the *longest* sentence that the statute punishing a crime permits a court to impose." *Id*. at 1191–92 (emphasis added).

Holzer's only response to the government's argument is that it is foreclosed by our decision in *United States v. Williams*, 10 F.4th 965 (10th Cir. 2021). We disagree. The

16

defendant in *Williams*, who pleaded guilty to bank fraud, sought on appeal to challenge

the amount of restitution that the district court ordered him to pay to his bank victims.

The government argued in response that the defendants' arguments were precluded by an

appellate waiver provision in the parties' written plea agreement. That appellate waiver

provision, like the one at issue here, stated that the defendant waived the right to appeal

any matter in connection with his sentence unless "the sentence exceed[ed] the maximum

penalty provided in the statutes of conviction." 10 F.4th at 971. In addressing the

government's argument, we noted that the parties' plea agreement also included "a

section entitled 'STATUTORY PENALTIES'" that outlined the maximum term of

imprisonment, the maximum fine, the maximum term of supervised release, and also

stated "plus restitution." *Id*. at 971–72. In light of the plea agreement's express reference

to "plus restitution," we concluded as follows:

> We recognize that restitution presents a less-obvious sort of "maximum"
> than do the other categories of penalties. For instance, the statutory
> maximum prison time of 30 years is self-evident. Determining the
> maximum restitution requires more work. In identifying the MVRA's
> limits in a particular case, a district court must find facts and then apply
> them through a multi-layered legal framework. For instance, the amount of
> restitution a court may order to most victims is limited to the losses directly
> and proximately caused by the defendant's conduct underlying the offense
> of conviction, though the amount of restitution a court may order to some
> victims is limited to the losses directly caused by a defendant's conduct in a
> scheme. *See* 18 U.S.C. § 3663A(a)(2).

> But the government drafted the Plea Agreement, including the appeal
> waiver and associated provisions. And we read any ambiguities in appeal
> waivers against the government and in favor of a defendant's appellate
> rights. *Lonjose*, 663 F.3d at 1297 (citations omitted). On appeal, Williams
> has made a sufficient threshold argument that the total restitution exceeds
> the MVRA's limit (i.e., what the district court had authority to order paid to
> WebBank) that he may proceed to the merits. *See Gordon*, 480 F.3d at

1208–10 (reading the plea agreement as a whole in determining that the terms of the appeal waiver didn't waive the defendant's ability to challenge the restitution order as illegal under the MVRA); *cf. United States v. Cooper*, 498 F.3d 1156, 1158–60 (10th Cir. 2007) (enforcing an appeal waiver of the "sentence as imposed by the Court and the manner in which the sentence is determined" against a challenge to restitution). If the government expects us to enforce an appeal waiver in circumstances like these, it needs to write a better appeal waiver. We conclude that Williams's appeal waiver doesn't bar his appeal of the restitution order.

*Id.* at 972.

*Williams* is not controlling here. To begin with, *Williams* involved an award of restitution under the MVRA, and not a special condition of supervised release imposed under § 3583. An award of restitution always involves a quantifiable amount of money, whereas a special condition of supervised release, such as Special Condition Nine in this case, is typically not quantifiable in nature. Indeed, Special Condition Nine is not quantifiable at all, and instead prohibits Holzer from possessing items of a certain character. Although Holzer argues that there is no real "distinction between a sentence that exceeds the limits of the law and a sentence that exceeds the statutory maximum," we reject his position and conclude that there is in fact a material distinction between those two things. Aplt. Reply Br. at 9.

Ultimately, we conclude that the phrase "maximum penalty provided in the statute of conviction," which is employed in the appellate waiver provision of the parties' plea agreement, cannot, as Holzer suggests, reasonably be construed to refer to both quantities of time (i.e., months, years) *and* to limitations on the type of actions a defendant can take while on supervised release. Those limitations, while subject to statutory constraints, are

18

not quantifiable in the same manner as quantities of time or, for that matter, quantities of money.

We therefore conclude, in sum, that the issues that Holzer seeks to raise on appeal fall within the scope of the appellate waiver provision of his plea agreement, but do not fall within the scope of exception (1) to the appellate waiver provision.[3]

### b) Knowing and voluntary

"The second prong of the [*Hahn*] analysis requires [us] to ascertain whether [Holzer] knowingly and voluntarily waived his appellate rights." 359 F.3d at 1325. Notably, Holzer does not dispute that he knowingly and voluntarily waived his appellate rights. And, in any event, the record on appeal firmly indicates that he did. More specifically, the language of the parties' plea agreement expressly states that Holzer "knowingly and voluntarily waive[d] the right to appeal any matter in connection with th[e] prosecution, conviction, or sentence" unless it met one of the specified exceptions. ROA, Vol. 1 at 63; *see Hahn*, 359 F.3d at 1325 (directing courts to "examine whether the language of the plea agreement states that the defendant entered the agreement knowingly and voluntarily"). Further, the transcript of the change-of-plea hearing indicates that the district court thoroughly questioned Holzer regarding his understanding of the terms of the plea agreement, including the appellate waiver provision, and the district court "f[ou]nd, explicitly, the waiver of appellate rights . . . [wa]s one which [wa]s knowingly

---

[3] Contrary to our ruling in *Hahn*, the Ninth Circuit would exclude from a general appellate waiver a constitutional challenge to a condition of supervised release unless specifically waived in the plea agreement. *United States v. Wells*, 29 F.4th 580, 587 (9th Cir. 2022).

and voluntarily made." ROA, Vol. 3 at 20; *see Hahn*, 359 F.3d at 1325 (directing courts

to "look for an adequate Federal Rule of Criminal Procedure 11 colloquy").

    *c)  Miscarriage of justice*

"The third prong of [*Hahn*'s] enforcement analysis requires [us] to determine

whether enforcing the waiver will result in a miscarriage of justice." *Hahn*, 359 F.3d

at 1327. A miscarriage of justice will occur only "in one of . . . four situations":

(1) "where the district court relied on an impermissible factor such as race" in

crafting its sentence; (2) "where ineffective assistance of counsel in connection with

the negotiation of the waiver renders the waiver invalid"; (3) "where the sentence

exceeds the statutory maximum"; or (4) "where the waiver is otherwise unlawful,"

meaning that "the error must seriously affect the fairness, integrity or public

reputation of judicial proceedings, as that test was employed in *United States v.

Olano*, 507 U.S. 725, 732 (1993)." *Hahn*, 359 F.3d at 1327 (internal quotation marks

and brackets omitted).

Holzer argues that enforcing the appellate waiver provision would result in a

miscarriage of justice in this case. Aplt. Reply Br. at 10. In support, Holzer again

asserts that the district court lacked authority under § 3583 to impose Special

Condition Nine, and he asserts that, in any event, Special Condition Nine infringes on

his First Amendment rights, specifically his right to freely practice his religion and

his right to receive information.

It is not entirely clear which of the four situations outlined in *Hahn* Holzer is

relying on in asserting his miscarriage of justice argument. Clearly, neither the first

20

nor second apply here because the district court did not rely on an impermissible factor in crafting its sentence and there is no allegation that defense counsel was ineffective in connection with the negotiation of the appellate waiver. That leaves the last two situations.

We have held, in interpreting the third situation identified in *Hahn*, i.e., "where the sentence exceeds the statutory maximum," that the phrase "'statutory maximum' . . . refers to the upper limit of punishment that Congress has legislatively specified for the violation of a given statute." *Green*, 405 F.3d at 1194. For the reasons previously discussed, we conclude that this includes only the quantifiable aspects of punishment, such as the length of supervised release, and not any special conditions of supervised release that impose limits on a defendant's conduct.

That leaves only the final situation listed in *Hahn*, i.e., where the waiver is otherwise unlawful.[4] We have held that "[t]his [fourth *Hahn*] exception looks to whether 'the *waiver* is otherwise unlawful,' not to whether another aspect of the [sentencing] proceeding may have involved legal error." *United States v. Smith*, 500 F.3d 1206, 1213 (10th Cir. 2007) (emphasis in original) (internal quotation marks and citation omitted). In other words, our "inquiry is not whether the sentence is unlawful, but whether the waiver itself is unlawful because of some procedural error

---

[4] The lead opinion in *Hahn* stated that this fourth situation will arise only when "the alleged error . . . satisf[ies] the fourth prong of the . . . plain error test" outlined in *United States v. Olano*, 507 U.S. 725 (1993). 359 F.3d at 1329. Importantly, however, this portion of the *Hahn* opinion did not garner a sufficient number of votes to constitute a majority of the en banc court and therefore is not considered part of the holding in the case.

or because no waiver is possible." *United States v. Sandoval*, 477 F.3d 1204, 1208 (10th Cir. 2007). "An appeal waiver is not 'unlawful' merely because the claimed error would, in the absence of waiver, be appealable." *Id*. And "[t]he defendant bears the burden of persuasion" in establishing the unlawfulness of the waiver itself. *Id*.

Holzer has not alleged, let alone established, that the appellate waiver is otherwise unlawful. Instead, as noted, his only argument is that Special Condition Nine infringes on his First Amendment rights. We have previously rejected, albeit in an unpublished decision, the assertion that the occurrence of constitutional errors during sentencing is sufficient to establish that the waiver itself was unlawful, and we reaffirm that conclusion here. *See United States v. Bartholomew*, 608 F. App'x 668, 669 (10th Cir. 2015) (rejecting defendant's argument "that the appeal waiver [wa]s 'otherwise unlawful' and enforcing it would result in a miscarriage of justice . . . because 'the district court committed constitutional error in finding that it must impose the 120-month mandatory minimum sentence'").

   *d)  Conclusion*

For these reasons, we conclude that the waiver contained in the parties' written plea agreement is valid and enforceable, and that it precludes Holzer from appealing Special Condition Nine of his term of supervised release.

### III

The appeal is DISMISSED.

22