139 Nev., Advance Opinion 42

IN THE SUPREME COURT OF THE STATE OF NEVADA

ANTONIO CRUZ ALDAPE,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 83622

FILED

SEP 28 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, entered pursuant to a guilty plea, of two counts of attempted lewdness with a child under 14. Eighth Judicial District Court, Clark County; Eric Johnson, Judge.

*Affirmed in part, reversed in part, and remanded.*

Darin Imlay, Public Defender, and Katherine E. Sitsis and Nadia Hojjat Wood, Chief Deputy Public Defenders, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jonathan VanBoskerck, Chief Deputy District Attorney, and Elan Adam Eldar, Deputy District Attorney, Clark County,
for Respondent.

Christopher M. Peterson, Las Vegas, and Randolph M. Fiedler, Las Vegas, for Amici Curiae American Civil Liberties Union of Nevada and Nevada Attorneys for Criminal Justice.

_____

BEFORE THE SUPREME COURT, EN BANC.[1]

_____

[1]The Honorable Douglas W. Herndon, Justice, is disqualified from participation in the decision of this matter.

23-31825

*OPINION*

By the Court, PICKERING, J.:

Appellant Antonio Aldape pleaded no contest to two counts of attempted lewdness with a child. The district court placed him on probation and imposed the special condition mandated by NRS 176A.410(1)(q), which prohibits any defendant who is on probation for a sexual offense from accessing the internet or possessing a device capable of accessing the internet without their probation officer's permission. On appeal, Aldape challenges the mandatory internet ban on First Amendment grounds. He argues that it fails intermediate scrutiny because a categorical prohibition on internet access by any probationer convicted of a sex offense is not narrowly tailored to the risk of online predatory behavior the individual probationer may pose. We agree and reverse the judgment as to the probation condition banning access to the internet. We otherwise affirm and, in doing so, reject Aldape's separate challenge to the additional probation condition forbidding him from visiting places such as playgrounds and schools that primarily cater to children.

I.

Aldape pleaded guilty pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to two counts of attempted lewdness with a child under 14 for interactions with his step-granddaughter, V.I. The interactions occurred at Aldape's home and did not involve other children or the internet. The plea agreement permitted Aldape to substitute a guilty plea to two counts of sexually motivated coercion upon successful completion of probation and waived Aldape's right to a "direct appeal of [the] conviction." When the district court canvassed Aldape before accepting his plea, it asked Aldape if he understood that he was "waiving, that is giving up[,] your right to a jury

SUPREME COURT
OF
NEVADA

(O) 1947A

2

trial and all the other rights I've just discussed and the rights that are set out and mentioned in your Guilty Plea Agreement[.]" The court did not ask any questions specific to the appeal waiver.

Aldape was adjudged guilty and given a suspended aggregate prison term of 8 to 20 years, with probation not to exceed 5 years. His judgment of conviction imposed the two probation conditions he now challenges: special condition 15, which prohibits Aldape from accessing the internet or possessing a device that can access the internet; and special condition 11, which prohibits Aldape from being "in or near" playgrounds, parks, schools, and businesses that primarily cater to children. Aldape challenged both conditions in district court on substantially the same grounds he raises on appeal. The district court rejected Aldape's challenges, and this appeal timely followed.

## II.

As a threshold issue, the State argues that Aldape waived his right to appeal the conditions of his probation pursuant to the section of his plea agreement waiving his "right to a direct appeal of this conviction." In evaluating appeal waiver claims, courts consider "whether: (1) the appeal falls within the scope of the waiver; (2) both the waiver and plea agreement were entered into knowingly and voluntarily; and (3) enforcing the waiver would . . . result in a miscarriage of justice." *United States v. Adams*, 12 F.4th 883, 888 (8th Cir. 2021); *United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004) (en banc); *see Burns v. State*, 137 Nev. 494, 499-500, 495 P.3d 1091, 1099-1100 (2021). Although the parties address all three criteria, we only need to discuss the first—the scope of the waiver. In the plea agreement, Aldape waived the right to appeal his conviction, not his sentence or the probation conditions associated with his sentence. We

therefore conclude that Aldape's appeal may proceed because his challenges to his probation conditions fall outside the scope of the appeal waiver. *See Garza v. Idaho*, 586 U.S. ___, ___, 139 S. Ct. 738, 744 (2019) ("As courts widely agree, a valid and enforceable appeal waiver only precludes challenges that fall within its scope.") (internal quotations omitted).

Contract principles apply to plea agreements, *Burns*, 137 Nev. at 496, 495 P.3d at 1097, and to appeal waivers in plea agreements, *see Garza*, 586 U.S. at ___, 139 S. Ct. at 744. A plea agreement is enforced as written, *Burns*, 137 Nev. at 497, 495 P.3d at 1097, "according to what the defendant reasonably understood when he or she entered the plea," *Sullivan v. State*, 115 Nev. 383, 387, 990 P.2d 1258, 1260 (1999). In the appeal waiver context, given the important rights at stake, the State "bears the burden of proving that the plea agreement clearly and unambiguously waives a defendant's right to appeal." *Adams*, 12 F.4th at 888. Ambiguities as to the scope of the waiver are construed against the State as the drafter of the plea agreement. *Id.*; *see Burns*, 137 Nev. at 497, 495 P.3d at 1098.

The appeal waiver clause in Aldape's plea agreement did not refer to his sentence or probation conditions. It stated that he waived his right to appeal his conviction:

> By entering my plea of guilty, I understand that I am waiving and forever giving up the following rights and privileges:
>
> . . . .
>
> (6) *The right to appeal the conviction* with the assistance of an attorney, either appointed or retained, unless specifically reserved in writing and agreed upon as provided in NRS 174.035(3). *I understand this means I am unconditionally waiving my right to a direct appeal of this conviction,* including any challenge based upon reasonable constitutional, jurisdictional or other

SUPREME COURT
OF
NEVADA

(O) 1947A

4

grounds that challenge the legality of the proceedings as stated in NRS 177.015(4). However, I remain free to challenge my conviction through other post-conviction remedies including a habeas corpus petition pursuant to NRS Chapter 34.

(emphases added). As Aldape argues, the words "conviction" and "sentence" mean two different things. "Conviction" denotes guilt: "The act or process of judicially finding someone guilty of a crime; the state of having been proved guilty" or "[t]he judgment (as by a jury verdict) that a person is guilty of a crime." *Conviction, Black's Law Dictionary* (11th ed. 2019). "Sentence," by contrast, means "[t]he judgment that a court formally pronounces after finding a criminal defendant guilty: the punishment imposed on a criminal wrongdoer." *Sentence, id.*

The State argues that Aldape's appeal waiver covers the probation conditions imposed at time of sentencing, citing *United States v. Wells*, 29 F.4th 580 (9th Cir. 2022), and *United States v. Holzer*, 32 F.4th 875 (10th Cir. 2022), as support. But on close reading, *Wells* and *Holzer* support Aldape's position, not the State's. Unlike Aldape's appeal waiver, which only referenced his conviction, the waivers in *Wells* and *Holzer* applied to *both* the conviction *and* the sentence. Thus, in *Wells*, the waiver stated: "I agree to give up my right to appeal the judgment and all orders of the court. *I also agree to give up my right to appeal any aspect of my sentence*," 29 F.4th at 584 (emphasis added), while in *Holzer*, the defendant waived "the right to appeal any matter in connection with this prosecution, conviction, *or sentence*," 32 F.4th at 880 (emphasis added). The defendants in *Wells* and *Holzer* could not appeal their supervised release conditions because the conditions are an aspect of sentencing, which their appeal waivers covered. *Wells*, 29 F.4th at 584 (noting that an appeal waiver's "reference to 'any aspect of the sentence' unambiguously encompassed

SUPREME COURT
OF
NEVADA

(O) 1947A

supervised release terms") (internal quotation omitted); *see Holzer*, 32 F.4th at 882; *accord United States v. Andis*, 333 F.3d 886, 893 n.7 (8th Cir. 2003).

Most reported cases consider appeal waivers that, like those in *Wells* and *Holzer*, apply to both conviction and sentence. But in cases where the appeal waiver is not specific, or only references the conviction, courts have held that appeals challenging the sentence or conditions of supervised release fall outside the appeal waiver and can proceed. *See, e.g., Williams v. Indiana*, 164 N.E.3d 724, 725 (Ind. 2021) (allowing the defendant to appeal his sentence where the appeal waiver did not specifically preclude it and noting that "the plea agreement, guilty plea and sentencing hearing colloquy, and sentencing order must be clear and consistent as to whether the defendant waives only the right to appeal the conviction or the right to appeal the conviction and sentence"); *Kansas v. Patton*, 195 P.3d 753, 771 (Kan. 2008) (declining to construe an appeal waiver as precluding an appeal of a sentencing decision where the waiver did not explicitly refer to the sentence); *cf. Garza*, 586 U.S. at ___ & n.5, 139 S. Ct. at 744 & n.5 (citing *Patton* and referencing other examples of appeal waivers that allowed challenges to the sentence); *United States v. Pam*, 867 F.3d 1191, 1201 (10th Cir. 2017) (holding that a waiver of collateral attack to the conviction does not include attacks on the sentence), *abrogated on other grounds by Borden v. United States*, ___ U.S. ___, 141 S. Ct. 1817 (2021). And this is only fair. Given the difference in meaning between "conviction" and "sentence," a defendant signing an agreement that waives the right to appeal the conviction would not logically understand it to preclude appeal of probation conditions imposed later, at time of sentencing. *See Williams*, 164 N.E.3d at 725. This is especially true where, as here, the plea agreement did not bind the district court to a particular sentence and the defendant was not

canvassed about the appeal waiver's scope. *See Sullivan*, 115 Nev. at 387, 990 P.2d at 1260 (construing plea agreement according to what a defendant reading it would reasonably understand).

Shifting focus, the State argues that Aldape gave up his right to appeal his probation conditions because he waived the right to challenge the legality of the proceedings in the appeal waiver. But in making this argument, the State misquotes the text of the appeal waiver clause—Aldape waived his "right to a direct appeal *of this conviction, including* any challenge based upon reasonable constitutional . . . grounds that challenge the legality of the proceedings." (emphasis added). The State omits the italicized language—"*of this conviction, including*"—which grammatically ties what follows the word "including" to its antecedent, "this conviction." The appeal waiver's reference to "the legality of the proceedings" does not expand the word "conviction" to include sentencing and release conditions. *Cf. People v. DeVaughn*, 558 P.2d 872, 875 (Cal. 1977) (construing the phrase to mean "the legality of the proceedings resulting in the plea"). At best, the phrase introduces an ambiguity, which is resolved against the State. *See Burns*, 137 Nev. at 497, 495 P.3d at 1098. The State's final point—that we should construe "conviction" to include "sentence" because NRS 176.105 requires both for a "judgment of conviction"—also fails as a matter of contract construction. The appeal waiver used the word "conviction," not the phrase "judgment of conviction." As the drafter of the plea agreement, the State is bound by the plain meaning of the words it used, and those words do not preclude this appeal.

III.

If a district court grants probation to a defendant convicted of a sexual offense as defined in NRS 179D.097, it must impose the probation

conditions enumerated in NRS 176A.410(1), including subsection (q), which requires that the defendant "[n]ot possess any electronic device capable of accessing the Internet and not access the Internet through any such device or any other means, unless possession of such a device or such access is approved by the [defendant's] probation officer." The district court incorporated subsection (q) verbatim as special condition 15 of Aldape's probation. On appeal, Aldape challenges the constitutionality of subsection (q) and special condition 15 under the First Amendment. Although we review a district court's discretionary imposition of a probation condition for an abuse of discretion, *Igbinovia v. State*, 111 Nev. 699, 707, 895 P.2d 1304, 1309 (1995), the constitutionality of a statutorily mandated probation condition presents a question of law to which de novo review applies, *see Mangarella v. State*, 117 Nev. 130, 133-36, 17 P.3d 989, 991-93 (2001).

A.

The internet affords a First Amendment forum of historically unimaginable reach. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Today, that place is "cyberspace—the vast democratic forums of the Internet." *Id.* (internal quotation omitted).

In *Packingham*, the Supreme Court struck down a North Carolina statute that made it a felony for a registered sex offender to access social media sites like Facebook that children frequent. *Packingham* recognized for the first time a broad First Amendment right to internet access, inclusive of individuals who had been convicted of and served their sentences for serious sex offenses. *Id.* at 108. While that right could be abridged by "specific, narrowly tailored laws" aimed at "conduct that often

SUPREME COURT
OF
NEVADA

(O) 1947A

presages a sexual crime," it could not be snuffed out by North Carolina's "sweeping" statute without a showing that its breadth was necessary to "keep[ ] convicted sex offenders away from vulnerable victims." *Id.* at 107.

The State would limit the rights recognized in *Packingham* to people who, unlike Aldape, have completed their sentence and are no longer under court-supervised release. Probationers "do not enjoy the absolute liberty to which every citizen is entitled," *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (internal quotations omitted), and "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens," *United States v. Knights*, 534 U.S. 112, 119 (2001). For these reasons, on a continuum ranging from incarceration to release following completion of sentence, defendants on probation "enjoy less freedom than those who have finished serving their sentences." *United States v. Holena*, 906 F.3d 288, 295 (3d Cir. 2018). But that does not mean that the First Amendment right to internet access recognized in *Packingham* has no application to probationers. While a probationer's First Amendment rights may be restricted, under *Packingham* those restrictions must be narrowly tailored with a view to the goals of supervised release—"deterring crime, protecting the public, [and] rehabilitating the defendant." *Id.*; *see United States v. Eaglin*, 913 F.3d 88, 97 (2d Cir. 2019) (applying *Packingham* and holding that "the imposition of a total Internet ban as a condition of supervised release inflicts a severe deprivation of liberty" that can only be justified in "highly unusual circumstances"); *People v. Morger*, 160 N.E.3d 53, 69 (Ill. 2019) (invalidating a statutorily mandated probation condition banning social media access under *Packingham*).

SUPREME COURT
OF
NEVADA

(O) 1947A

9

The State cites *United States v. Carson*, 924 F.3d 467, 473 (8th Cir. 2019), *United States v. Halverson*, 897 F.3d 645, 658 (5th Cir. 2018), and *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017), as support for limiting *Packingham* to people who have finished serving their sentences. These opinions evaluated internet restrictions discretionarily imposed by the sentencing court as conditions of their court-supervised release. Since the defendants in the cited cases did not raise their First Amendment challenges in district court, their appeals were decided on plain error review, a deferential standard requiring that the district court commit a legal error that is "clear or obvious, rather than subject to reasonable dispute." *Halverson*, 897 F.3d at 657; *see Carson*, 924 F.3d at 473, *Rock*, 863 F.3d at 831. By contrast, Aldape preserved his First Amendment challenge to subsection (q) and special condition 15 in district court, so our review is de novo, not for plain error. While the difference in the defendants' supervision status sufficiently distinguished *Packingham* to prevent reversal for plain error in *Carson*, *Halverson*, and *Rock*, that difference does not limit *Packingham*'s application on de novo review.

Finally, and most importantly, in applying the First Amendment to 21st century norms, *Packingham* formalized an undeniable truth—there is simply no way to participate in modern society without internet access or a "device capable of accessing the Internet." That fact does not change, and perhaps becomes even more salient, when applied to people under active court supervision. It would, for example, be hopelessly difficult to meet with one's probation officer without using a cell phone to make the appointment, get directions, arrange transportation, and set reminders. Then there are the rehabilitative steps: finding a job, renting a home, communicating with family and friends, and civic participation all

SUPREME COURT
OF
NEVADA

(O) 1947A

10

often require an internet connection. *See Packingham*, 582 U.S. at 108 ("Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives."). And one could avoid interactions with "internet-connected devices" only by never leaving the home—but even there, the television, phone, speakers, and appliances all pose a threat. It makes little sense to differentiate by supervision status a constitutionally protected right to access these everyday necessities when modern life makes no such distinctions.

*Packingham* therefore assists us in holding that the First Amendment protects the right of court supervisees, including Aldape, to access the internet.

B.

When a government imposes a content-neutral restriction on speech or conduct protected by the First Amendment, we apply intermediate scrutiny to evaluate whether the restriction is "narrowly tailored to serve a significant government interest" and "leaves open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see Packingham*, 582 U.S. at 105-06. Because NRS 176A.410(1)(q) restricts the time, place, and manner of a probationer's access to the internet and is otherwise neutral as to the content of any expressions made therein, intermediate scrutiny applies. *See Ward*, 491 U.S. at 791 (noting that "a regulation that serves purposes unrelated to the content of expression is deemed neutral," including time, place, or manner restrictions). In such circumstances, the State "bears the burden of proving the constitutionality of its actions." *Watchtower Bible & Tract Soc'y of N.Y.,*

SUPREME COURT
OF
NEVADA

(O) 1947A

11

*Inc. v. Village of Stratton*, 536 U.S. 150, 170 (2002) (Breyer, J., concurring) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)).

The State undoubtedly has a significant interest in protecting the public from online conduct that constitutes or "presages a sexual crime." *Packingham*, 582 U.S. at 107.[2] The parties agree on that much but diverge as to whether and how narrowly subsection (q) is tailored to that goal.

The State argues that subsection (q) is necessary to prevent every person convicted of a sexual offense from getting online because they are both more likely to recidivate than other offenders and more likely to do so online. But even assuming the State's data to that effect are true, subsection (q) does not "alleviate th[o]se harms in a direct and material way," as is required by narrow tailoring. *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 664 (1994). The category of "sexual offenses" includes everything from public indecency to violent assaults to production of pornography. NRS 176A.410(7), NRS 179D.097. It is illogical that each sexual offender, regardless of crime, rehabilitative needs, history of internet usage, or victim, poses an equally grave threat online, and the State cannot enact such a sweeping prohibition based on generalizations. *See Packingham*, 582 U.S. at 108 (concluding that North Carolina failed to show the "sweeping law" at issue was necessary or legitimate to serve "its

---

[2]This court has long recognized an equally significant government interest in the defendant's rehabilitation. *See Mangarella*, 117 Nev. at 137, 17 P.3d at 993 (stating that probation conditions must be "reasonably related to rehabilitation or the health, safety or welfare of the community"); *Seim v. State*, 95 Nev. 89, 93, 590 P.2d 1152, 1154 (1979) ("[T]he broad objective of probation is rehabilitation with incidental public safety, and . . . the conditions of probation should further provide this objective.").

preventative purpose of keeping convicted sex offenders away from vulnerable victims"); Morger, 160 N.E.3d at 69 (addressing Packingham's conclusion that "[t]he broad ban of the law could not be sustained solely on the ground that it protected the public against sex offenders").

This is not to say that a court cannot, in an appropriate case, limit internet access by a person convicted of a sexual offense. Broad restrictions on internet access may be justified "where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." United States v. Perazza-Mercado, 553 F.3d 65, 71 (1st Cir. 2009) (collecting cases); see United States v. Albertson, 645 F.3d 191, 197 (3d Cir. 2011) (noting that a complete ban "will rarely be sufficiently tailored"). In these scenarios, a broad internet ban is necessary because the supervisee's individual traits pose an equally broad threat. See, e.g., Albertson, 645 F.3d at 197-200 (noting that a broad ban may be "imposed temporarily on those offenders who have used or have clearly demonstrated a willingness to use the internet as a direct instrument of physical harm" and invalidating the imposition of such a ban on a supervisee convicted of possessing child pornography); United States v. Johnson, 446 F.3d 272, 282-83 (2d Cir. 2006) (concluding that a complete ban was justified by a supervisee's "sophisticated computer us[age]" and skills in "circumventing the software needed for monitoring" after his conviction for using the internet to contact and lure minors); Holena, 906 F.3d at 292 (invalidating a blanket internet ban imposed as a condition of supervised release but noting that, where a defendant used the internet to solicit a child for sex, "it is almost certainly appropriate to prevent [them]

SUPREME COURT
OF
NEVADA

(O) 1947A

13

from using social media, chat rooms, peer-to-peer file-sharing services, and any site where he could interact with a child" and to "consider the efficacy of filtering and monitoring software"). The problem with subsection (q) is not that an internet ban can never be applied; it is that it cannot mandatorily be applied to every person convicted of a sexual offense without the sentencing court considering the individualized factors that would justify such a ban.

Nor does subsection (q) permit the sentencing court to tailor internet restrictions to prevent only that "First Amendment activity [that is] necessary to protect anyone from misconduct that is a consequence of internet use." *Mutter v. Ross*, 811 S.E.2d 866, 871 (W. Va. 2018) (invalidating a condition of parole similar to the probation condition mandated by subsection (q)). Tailoring a condition of supervision to the individual empowers the sentencing court to serve the government's interests in supervision while respecting the supervisee's extant constitutional rights. The court thereby restricts only those aspects of the defendant's First Amendment rights implicated by their crime of conviction and threat to the community, rather than "treat[ing] all individuals who commit a sex offense as though they are highly sophisticated, online extortionists" or prohibiting economic, political, or interpersonal speech online that poses no threat of sexual misconduct. Jacob Hutt, *Offline: Challenging Internet and Social Media Bans for Individuals on Supervision for Sex Offenses*, 43 N.Y.U. Rev. L. & Soc. Change 663, 677-86 (2019) (noting that internet restrictions run afoul of the First Amendment when they target the "wrong people" or the "wrong speech"). Our sister courts and the federal government have solved this problem by imposing statutory or common law guidelines for tailoring internet restrictions on supervisees.

14

*See, e.g.*, 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D) (requiring that conditions of supervised release be "reasonably related" to the defendant's offense and rehabilitation, need for deterrence, and community safety); 18 U.S.C. § 3583(d) (requiring that conditions "involve[ ] no greater deprivation of liberty than is reasonably necessary"); *Morger*, 160 N.E.3d at 60 (invalidating as facially unconstitutional a statute imposing a blanket social media ban on probationers convicted of sexual offenses, while acknowledging more narrowly tailored measures that could achieve the same protective and rehabilitative objectives); *Weida v. State*, 94 N.E.3d 682, 690 (Ind. 2018) (requiring that probation conditions be "reasonably related to rehabilitating the probationer and protecting the public"); *see Dalton v. State*, 477 P.3d 650, 651 (Alaska Ct. App. 2020) (applying "special scrutiny" to "probation conditions that infringe constitutional rights"); *Fazili v. Commonwealth*, 835 S.E.2d 87, 94 (Va. Ct. App. 2019) (invalidating an internet ban where the record did not show that the internet played a role in the crime and the sentencing court did not articulate how the broad restriction "would serve any rehabilitative or public purpose").

By contrast, Nevada appears to be the only state in the nation that statutorily mandates its sentencing courts to impose an identical and total internet ban on every defendant who is granted probation after being convicted of a sexual offense, without regard for the nature of the defendant's crime of conviction, internet usage history, or threat to online users. *See* Hutt, *supra*, at 681 n.92 and accompanying text (collecting state statutes that impose internet bans, none of which is as broad as subsection (q)). This breadth would have been less remarkable in 2001, when the statute was first added and the First Amendment implications of internet connectivity had not yet matured. But the internet has since evolved into

SUPREME COURT
OF
NEVADA

(O) 1947A

15

an essential public forum, while subsection (q) has gone unamended. *See* Hutt, *supra,* at 667 n.17 (collecting scholarship examining *Packingham*'s "treatment of the Internet as a public forum"). As evidenced by the rigorous tests placed on such restrictions in the interim, the statute has become fatally outmoded.

The State argues that subsection (q) is adequately tailored because (1) Aldape is only subject to the condition for five years; (2) the district court can modify the conditions under "extraordinary circumstances," NRS 176A.410(6); and (3) Aldape can access the internet or connected devices with the prior approval of his probation officer, NRS 176A.410(1)(q). But because Aldape challenges the facial validity of the statute, its finite application to him does not change the analysis. And the phrase "extraordinary circumstances" denotes "a highly unusual set of facts that are not commonly associated with a particular thing or event." *Extraordinary Circumstances, Black's Law Dictionary* (11th ed. 2019). Confining the court's discretion to only extraordinary circumstances does not permit the tailoring necessary to save the statute's constitutionality.

Other courts have spoken directly and convincingly about the dangers of entrusting the constitutionality of a statute to the sole discretion of nonjudicial officers. *See, e.g., Holena,* 906 F.3d at 293 (finding fault with the district court offering "no guidance on the sorts of internet use" that the probation office should approve); *United States v. Ramos,* 763 F.3d 45, 61 (1st Cir. 2014) (finding that such permission "does not immunize the ban from an inquiry that evaluates the justification for the ban in the first instance"); *Doe v. Jindal,* 853 F. Supp. 2d 596, 604 (M.D. La. 2012) (finding permission inadequate because the statute did "not define the standards to be used in evaluating the requests for an exemption"); *Dalton,* 477 P.3d at

SUPREME COURT
OF
NEVADA

(O) 1947A

16

653 (recognizing that under more recent jurisprudence, prior approval "is not a sufficient safeguard for First Amendment rights in this context"); *cf. J.I. v. N.J. State Parole Bd.*, 155 A.3d 1008, 1023 (N.J. 2017) (stating that the justification for internet restrictions must be based on "more than the caprice of a parole officer") (internal quotations omitted). The approval escape valve cannot save the statute's constitutionality, particularly without any guidelines on how and when it applies.

Aldape's case is the perfect example of the impropriety of a blanket internet ban. His victim was a family member who lived with or near him, and the record does not demonstrate any predatory online behaviors that would justify a generalized internet restriction. Because NRS 176A.410(1)(q) is both mandatory and restricts more speech than necessary to serve the government's interest with no tailoring mechanism, and the State fails its burden to show otherwise, it is facially unconstitutional under the First Amendment.[3]

## IV.

Aldape also challenges special probation condition 11, which reads:

> Unless approved by the Parole and Probation Officer assigned to the Defendant and by a psychiatrist, psychologist or counselor treating the Defendant, if any, [the Defendant must] not be in or near:
>
> 1. a playground, park, school or school grounds.

---

[3]We do not address the State's request that we instruct the district court to determine whether a narrower internet restriction should be imposed under its discretionary authority in NRS 176A.400, because it is not adequately briefed. This is a matter for the State to address to the district court in the first instance.

> 2. a motion picture theater, or
>
> 3. a business that primarily has children as customers or conducts events that primarily children attend.

He argues that the district court abused its discretion by imposing this condition pursuant to NRS 176A.400(1)(c)(3) because it mirrors a mandatory condition imposed on Tier III offenders pursuant to NRS 176A.410(1)(m), but he is only a Tier II offender. That subsection (m) is mandatory for Tier III offenders, however, does not impede the district court's discretion to impose a similar condition under NRS 176A.400(1)(c)(3), permitting any reasonable condition "prohibiting the probationer from entering certain geographic areas."

The district court's imposition of a nonmandatory condition of probation is reviewed for an abuse of discretion, *Igbinovia*, 111 Nev. at 707, 895 P.2d at 1309, but questions of statutory interpretation are reviewed de novo, *State v. Lucero*, 127 Nev. 92, 95, 249 P.3d 1226, 1228 (2011). "[S]tatutory provisions of the probation scheme must be strictly construed," *Igbinovia*, 111 Nev. at 710, 895 P.2d at 1311, including any penal statutes that "negatively impact a defendant," *Mangarella*, 117 Nev. at 134, 17 P.3d at 992. Any "[d]iscretionary powers of the district court accorded by a statutory grant of authority must be interpreted liberally." *Igbinovia*, 111 Nev. at 710, 895 P.2d at 1311.

To resolve Aldape's argument that the district court exceeded its authority under NRS 176A.410(1)(m) because it imposed on him a condition meant only for Tier III offenders, we review subsection (m) de novo. Aldape's challenge is easily answered by the statute's plain language. *See Ramos v. State*, 137 Nev. 721, 722, 499 P.3d 1178, 1180 (2021) ("[W]e first look to the statute's plain language to determine its meaning, and we

SUPREME COURT OF NEVADA

(O) 1947A

18

will enforce it as written if the language is clear and unambiguous."). When read in conjunction with the sentence stem in NRS 176A.410(1), subsection (m) provides, "[T]he court *shall* . . . order as a condition of probation or suspension of sentence that the defendant . . . not knowingly be within 500 feet of any place . . . that is designed primarily for use by or for children . . . . The provisions of this paragraph apply only to a defendant who is a Tier III offender." (emphasis added). The meaning is clear—if the defendant is a Tier III offender, the court *must* impose subsection (m). The converse proposition is that the court *is not required to* impose subsection (m) if the defendant is a non-Tier III offender, not that the court *cannot* impose the restriction on non-Tier III offenders. Therefore, condition 11 is not prohibited by NRS 176A.410(1)(m).

Even so, condition 11 must be a proper exercise of the district court's discretion under NRS 176A.400, reviewed for an abuse of discretion. NRS 176A.400(1)(c)(3) permits the imposition of *any* reasonable conditions including, *without limitation*, "[p]rohibiting the probationer from entering a certain geographic area." Given this broad language and our obligation to liberally interpret the discretionary powers of the district court, *see Igbinovia*, 111 Nev. at 710, 895 P.2d at 1311, we conclude that the district court did not abuse its discretion because it is reasonable to restrict an adult convicted of a sexual offense involving a child from areas where children commonly are found. We do not reach Aldape's argument that condition 11 violates his First Amendment rights because he did not present a cogent argument to that effect in his opening brief, *see Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) ("Issues not raised in an appellant's opening brief are deemed waived."), although we note that similar restrictions are regularly upheld against constitutional

SUPREME COURT
OF
NEVADA

(O) 1947A

19

challenges when reasonable, *see, e.g.*, *United States v. Senke*, 986 F.3d 300, 318-19 (3d Cir. 2021); *United States v. MacMillen*, 544 F.3d 71, 75 (2d Cir. 2008).

Therefore, the district court permissibly imposed condition 11 on Aldape, both as a matter of statutory interpretation and pursuant to the discretion granted under NRS 176A.400.

## CONCLUSION

Because Aldape's appellate waiver did not preclude challenges to the conditions of his probation, and because subsection (q) is facially unconstitutional, we reverse and remand to the district court to remove condition 15, restricting Aldape's access to the internet and internet-connected devices, from the judgment of conviction. We otherwise affirm the district court's conviction, including the imposition of condition 11 restricting Aldape's entry into specific geographic areas, pursuant to NRS 176A.400.

_____, J.
Pickering

We concur:

_____, C.J.
Stiglich

_____, J.
Cadish

_____, J.
Lee

_____, J.
Parraguirre

_____, J.
Bell

SUPREME COURT
OF
NEVADA

(O) 1947A